**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

JOSEPH MENTER, JONATHAN
DANIELS, JAMES DAVIS,

      Plaintiffs,

v.                         Case Number: 3:17-cv-1029-J-39JBT

JUDGE MARK H. MAHON,
SHERIFF MIKE WILLIAMS,

      Defendants.

_____/

**SHERIFF WILLIAMS' MOTION TO DISMISS**
**AND INCORPORATED MEMORANDUM OF LAW**

      Defendant, SHERIFF MIKE WILLIAMS, in his official capacity as Sheriff of

Duval County, Florida ("Sheriff Williams"), moves the Court to dismiss the complaint

filed against him (the "Complaint") by Plaintiffs, JOSEPH MENTER, JONATHAN

DANIELS, and JAMES DAVIS (collectively, "Plaintiffs") pursuant to the abstention

principles announced in Railroad Commission of Texas v. Pullman Co., 312 U.S. 496

(1941), and Younger v. Harris, 401 U.S. 37 (1971), or, alternatively, to dismiss Count I

pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief may be

granted and to decline jurisdiction over Count II pursuant to 28 U.S.C. § 1367(c).[1]

## I.    INTRODUCTION

      Plaintiffs claim the process of setting bail for indigent misdemeanor arrestees in

Duval County violates the United States and Florida Constitutions. Abstention is

---

[1] Sheriff Williams adopts the arguments raised in the motion to dismiss filed or to be filed on behalf of Defendant, Judge Mark. H. Mahon, to the extent those arguments are equally applicable to Sheriff Williams.

appropriate in this case under the <u>Pullman</u> and <u>Younger</u> abstention doctrines. Specific provisions of the Florida constitution, statutes, and rules of criminal procedure govern the fixing of bail and supply a sufficient state-law basis for state courts to determine Plaintiffs' claims without reaching the federal constitutional question. Moreover, the declaratory and injunctive decree Plaintiffs request would impermissibly ensnare the federal courts in the state-court process of fixing bail, in contravention of the constitutionally-created boundary separating the state and federal judiciaries.

Alternatively, the Court should dismiss Plaintiffs' § 1983 action as to Sheriff Williams for failure to state a claim. Sheriff Williams and the officers and employees of the Jacksonville Sheriff's Office (the "JSO") do not fix bail. As Plaintiffs concede in their Complaint (Compl. ¶ 21), bail is set by the judges of the Fourth Judicial Circuit, pursuant either to a bail schedule promulgated by order of the chief judge or by the presiding judges' orders at first appearance. Therefore, Plaintiffs have not alleged, and cannot allege, that a policy or custom established or permitted by Sheriff Williams was the moving force behind the alleged constitutional injury. Upon dismissal of the § 1983 action, the Court should decline jurisdiction over the state-law constitutional claim in Count II.

## II.   **COMPLAINT ALLEGATIONS**

When a person is arrested in the City of Jacksonville (the "City") for a misdemeanor crime, he or she is taken to the Pre-Trial Detention Facility ("PTDF") operated by JSO. (Compl. ¶¶ 5 & 22). At the PTDF, JSO staff process the arrestee to determine if he or she is indigent and entitled to the appointment of a public defender.

(Id. ¶ 23).  If the arrestee is eligible for bail, the JSO must release the arrestee if he or she pays the bail amount corresponding to their offense as set forth on the "Misdemeanor Bond Schedule" promulgated by the chief judge of Florida's Fourth Judicial Circuit.  (Id. ¶¶ 21 & 24).  The Misdemeanor Bond Schedule is "the exclusive means of setting bail 'unless otherwise directed by the judge(s).'"  (Id. ¶ 21).  If the arrestee cannot pay this amount, he or she remains in jail and is taken to "first appearance" within twenty-four hours after arrest.  (Id. ¶ 25).  The judge presiding over first appearance determines whether probable cause for the charge exists, appoints a public defender if the arrestee is indigent, and either sets a monetary bond amount or authorizes the arrestee's release on "personal recognizance."  (Id. ¶¶ 26, 34, 35 & 39–43).  According to Plaintiffs, "[a]t no time does any person perform any inquiry into an arrestee's ability to pay the money bail amount written on the predetermined bond schedule or before setting any bond amount on cases that are not prescribed by the predetermined bond schedule."  (Id. ¶ 27).

Plaintiffs are three indigent individuals who were arrested by JSO officers in August 2017 and charged with misdemeanors.  (Compl. ¶¶ 18–20).  Each Plaintiff was taken to the PTDF and processed.  (Id.).  Each was given the opportunity to be released upon payment of their respective bond amounts dictated by the Misdemeanor Bond Schedule.  (Id.).  Each was allegedly unable to afford to pay the amount on the schedule and remained in jail pending first appearance.  (Id.).  Each was taken to first appearance within 24 hours of their arrest.  (Id.).  At first appearance, the judge presiding over their respective hearings set bail in an amount in excess of the amounts on the Misdemeanor

Bond Schedule.  (Id.). According to the Complaint, at no time was Plaintiffs' ability to pay considered in connection setting bail.  (Id. ¶¶ 27, 33, 36 & 38).

The Complaint contains the following allegations regarding the "policy and practice" of the JSO:

> 8.  JSO by policy and practice, detains arrestees too poor to afford the money bail amount imposed without inquiry into and findings concerning ability to pay and releases arrestees who pay their money bail.
>
> * * *
>
> 51.  As a matter of policy and practice, when a new arrestee is brought to the PTDF, City employees inform the arrestee that they will be released from jail upon payment of the money bail amount set by the bail schedule for certain misdemeanors. The arrestee is told that they will remain in jail if they are not able to make that payment.
>
> 52.  It is the policy and the practice of JSO to release only those arrestees who pay their money bail amount.
>
> 53.  It is the policy and the practice of the JSO to detain individuals who do not pay their money bail amount. Before an individual's probable cause hearing, it is the policy and the practice of the JSO to detain the individual based on a money bail amount set pursuant to a predetermined bail schedule. After the first appearance hearing, it is the policy and the practice of the JSO to detain individuals based on a money bail amount set by the Defendant Judges.
>
> 54.  If a person cannot pay his or her money bail after their first court appearance before a judge, it is the policy and the practice of the JSO to continue to detain that individual unless and until they make the required monetary payment.

Plaintiffs assert these "policies and practices" of the JSO violate the Equal Protection and Due Process Clauses of the United States Constitution and Article I, Sections 9 and 14 of the Florida Constitution.  Plaintiffs seek certification of a class of plaintiffs as well as certification of a class comprising the judges of Florida's Fourth

Judicial Circuit.  For relief, Plaintiffs seek a judicial declaration that keeping indigent misdemeanor arrestees in jail because they cannot afford to pay money bail without "any inquiry into or findings concerning" ability to pay violates the federal and state constitutions.   (Compl. pp. 21 & 22).   Plaintiffs further seek an order "enjoining Defendants from imposing secured financial conditions of release without first providing an inquiry into an arrestee's present ability to pay money bail and making findings that an arrestee has the present ability to pay any monetary amount set" and "[a]ny other order and judgment this Court deems necessary" to enjoin such activity.  (Id. pp. 21–23).

## III.   THE COURT SHOULD ABSTAIN UNDER PULLMAN AND YOUNGER

### A.   Pullman Abstention

Under the Pullman abstention doctrine, a federal court will defer to "state court resolution of underlying issues of state law" in order to "avoid unnecessary friction in federal-state relations, interference with important state functions, tentative decisions on question of state law, and premature constitutional adjudication." Harman v. Forssenius, 380 U.S. 528, 534 (1965).  Pullman abstention requires two elements:  "(1) an unsettled question of state law and (2) that the question be dispositive of the case and would avoid, or substantially modify, the constitutional question." Duke v. James, 713 F.2d 1506, 1510 (11th Cir. 1983).  Both elements are satisfied here.

Pretrial release is specifically addressed in the Florida Constitution, Florida Statutes, and Florida Rules of Criminal Procedure, as well as many decisions of the state courts of Florida.  Article I, Section 14 of the Florida Constitution provides that, with certain exceptions, "every person charged with a crime or violation of municipal or

county ordinance shall be entitled to pretrial release on reasonable conditions" and that the accused may be detained if "no conditions of release can reasonably protect the community from risk of physical harm to persons, assure the presence of the accused at trial, or assure the integrity of the judicial process."  Art. I, § 14, Fla. Const.  Florida statutory law contains an entire chapter concerning bail, see Ch. 903, Fla. Stat., including a section listing the factors the court must take into account when fixing bail, see § 903.046, Fla. Stat. (requiring consideration of "financial resources").  Rule 3.131 of the Florida Rules of Criminal Procedure also governs the fixing of bail by state courts.  And Florida's constitution includes equal protection and due process clauses.  See Art. I, §§ 2 & 9, Fla. Const.  Despite the many sources of Florida law on the issue of bail, there appears to be no decisional law specifically addressing Plaintiffs' state-law challenges to the bail procedures followed in Duval County.  Thus, the first requirement for Pullman abstention is satisfied.

The second Pullman requirement is also satisfied.  A state court's application of Florida law could be dispositive of the federal constitutional questions.  It is telling that Plaintiffs' federal and state law claims rely on the same allegations and request the same relief.  Thus, state law "appears to furnish easy and ample means for determining" this case.  Pullman, 312 U.S. at 501.  Because Florida courts are the final expositors of state law, abstention in this instance would protect "the harmonious relation between state and federal authority" and "the rightful independence of the state governments."  Id.

The Supreme Court considered an analogous circumstance in Reetz v. Bozanich, 397 U.S. 82 (1970).  Reetz involved a challenge to an Alaskan statute that limited

eligibility for certain fishing licenses to defined groups.  Id. at 83.  Opponents claimed the statute violated equal protection under the federal Constitution as well as provisions of the Alaska Constitution that specifically protected the right to fish.  Id. at 83–84.  The Supreme Court held that the district court should have abstained in order to permit the parties to seek a determination of the state-law issue from a state court.  Id. at 86–87.  The Court observed:  "A state court decision here . . . could conceivably avoid any decision under the Fourteenth Amendment and would avoid any possible irritant in the federal-state relationship.  The Pullman doctrine was based on 'the avoidance of needless friction' between federal pronouncements and state polices.  The instant case is the classic case in that tradition, for here the nub of the whole controversy may be the state constitution."  Id. (quoting Pullman, 312 U.S. at 500).  See also Askew v. Hargrave, 401 U.S. 476 (1971) (reversing refusal to abstain from a challenge to a Florida statute where a decision under the Florida Constitution would obviate a determination of federal law).  Thus, the Court should dismiss the case so that Plaintiffs may file a declaratory action in state court on the state-law issues.[2]

## B.    Younger Abstention

The Younger abstention doctrine directs federal courts to abstain from granting injunctive or declaratory relief that would interfere with pending state judicial proceedings where the constitutional issues may be raised.  The Younger abstention doctrine "derives from the vital consideration of comity between the state and national

---

[2] Ziegler v. Ziegler, 632 F.2d 535, 539 (5th Cir. 1980) ("The classic Pullman-type abstention order requires the parties to commence an action in state court for a declaratory judgment on the state law issues.").

governments, which *Younger* itself described as 'sensitivity to the legitimate interests of both State and National Governments.'" Pompey v. Broward Cty., 95 F.3d 1543, 1546–47 (11th Cir. 1996) (quoting Younger, 401 U.S. at 44) (quotation & citation omitted).[3] The Supreme Court has recognized that another "important reason for abstention is to avoid unwarranted determination of federal constitutional questions." Pennzoil Co. v. Texaco, Inc., 481 U.S. 1, 11 (1987) (holding Younger abstention appropriate where state constitutional provision "appears to address [the plaintiff's] claims more specifically than the Due Process Clause and the Fourteenth Amendment"). Abstention is required when "(1) the proceedings constitute an ongoing state judicial proceeding, (2) the proceedings implicate important state interests, and (3) there is an adequate opportunity in the state proceedings to raise constitutional challenges." Turner v. Broward Sheriff's Office, 542 Fed. Appx. 764, 766 (11th Cir. 2013).

Each of the elements for Younger abstention is present. First, the Complaint alleges that a criminal proceeding was pending against each Plaintiff at the time the Complaint was filed. (Compl. ¶¶ 18–20). See The News-Journal Corp. v. Foxman, 939 F.2d 1499, 1510 (11th Cir. 1991) (stating the "date of filing the federal complaint is the relevant date for purposes of determining *Younger*'s applicability").[4] Second, the proceedings against Plaintiffs involve the vitally important state interest of ensuring that criminal defendants appear for trial. Third, Plaintiffs had the opportunity to raise the

---

[3] Pennzoil Co. v. Texaco, Inc., 481 U.S. 1, 11 n.9 (1987) (noting "considerations similar to those that mandate *Pullman* abstention are relevant to a court's decision whether to abstain under *Younger*").

[4] Younger abstention also applies where the injunctive relief sought in a class action would interfere with criminal cases that are not yet pending. Pompey, 95 F.3d at 1547.

constitutional issue at first appearance (within 24 hours of arrest) and at other times during their proceedings. (Compl. ¶ 48). See also, Fla. R. Crim. P. 1.131(d).

Abstention under Younger is required to protect the foundational principles of federalism and comity. Plaintiffs would have the Court effectively re-work the system of bail in Duval County and then continuously monitor the activities of state-court judges and JSO employees to ensure compliance. The use of injunctive power to dictate how judges of the Fourth Judicial Circuit are to "provide an inquiry into and mak[e] findings concerning [a] person's ability to pay" (e.g., Compl. ¶ 13) is just the kind of "continuous supervision by the federal court over the conduct of [judges] in the course of future criminal trial proceedings" prohibited by Younger. O'Shea v. Littleton, 414 U.S. 488, 501 (1974). Any arrestee could claim that the state court undertook an inadequate injury or failed to make sufficient findings concerning ability to pay and thereby obtain federal review (possibly on an emergency basis) of the state court's bail decision. And by what standard would this Court review the decision? What is a constitutionally sufficient "inquiry" into ability to pay? What specific "findings" must the state court make to support its bail decision? How should the state court weigh the other important state interests that go into setting bail? And what would be the JSO's role in the new process? Either the Misdemeanor Bond Schedule would have to be abandoned (thereby prohibiting any opportunity for release prior to first appearance) or somehow Florida law would need to be re-written to permit the JSO to conduct hearings and make findings concerning bail. Of course, if the Court finds its injunction has been violated, it must be prepared to

enforce it with contempt if need be.  Such federal interference would violate principles of federalism and comity.

The Supreme Court and the Eleventh Circuit have refused to exercise jurisdiction in similar circumstances.  In O'Shea, class action plaintiffs sought to enjoin the allegedly unconstitutional practices of Illinois judges who, among other things, "set bond in criminal cases according to an unofficial bond schedule without regard to the facts of a case or circumstances of an individual defendant in violation of the Eighth and Fourteenth Amendments."  414 U.S. at 492.  After concluding that the threat of future injury to plaintiffs was "simply too remote to satisfy the case-or-controversy requirement," id. at 498, the Supreme Court proceeded to hold that abstention was warranted.  The Supreme Court observed:

> An injunction of the type contemplated by respondents . . . would disrupt the normal course of proceedings in the state courts via resort to the federal suit for determination of the claim ab initio, just as would the request for injunctive relief from an ongoing state prosecution against the federal plaintiff which was found to be unwarranted in Younger. Moreover, it would require for its enforcement the continuous supervision by the federal court over the conduct of the petitioners in the course of future criminal trial proceedings involving any of the members of the respondents' broadly defined class. . . . Moreover, because an injunction against acts which might occur in the course of future criminal proceedings would necessarily impose continuing obligations of compliance, the question arises of how compliance might be enforced if the beneficiaries of the injunction were to charge that it had been disobeyed. Presumably, any member of respondents' class who appeared as an accused before petitioners could allege and have adjudicated a claim that petitioners were in contempt of the federal court's injunction order, with review of adverse decisions in the Court of Appeals and, perhaps, this Court. Apart from the inherent difficulties in defining the proper standards against which such claims might be measured, and the significant problems of proving noncompliance in individual cases, such a major continuing intrusion of the equitable

> power of the federal courts into the daily conduct of state criminal
> proceedings is in sharp conflict with the principles of equitable restraint
> which this Court has recognized . . . .

Id. at 501–02 (citations & footnotes omitted).

In Pompey v. Broward County, the Eleventh Circuit considered a constitutional challenge to Broward County's practice of "Daddy Roundups," whereby judges ordered that fathers be detained for unpaid child support "without making an affirmative finding of fact regarding an individual's ability to pay." 95 F.3d at 1545–46. The plaintiffs wanted the district court to "order state judges to inquire specifically about each parent's ability to pay the child support amount in arrears." Id. at 1549. The Eleventh Circuit affirmed the district court's decision to abstain, finding that the requested injunction would constitute an "affront to comity." Id. at 1549. The court found that because Florida law already required an inquiry into ability to pay, the plaintiffs really wanted an order forcing the state courts to conduct a more "thorough inquiry." Id. Just what that inquiry would entail was too difficult to frame in a satisfactory way. Id. Even if it could be done, the court reasoned, "it would be unwise to do so" because

> such an injunction would be "at once an insult to the [state judges] . . .
> and an empty but potentially mischievous command to these officials to
> avoid committing any errors." It would ensnare the federal district court
> in relitigation of the state contempt proceeding issues, which is the kind
> of mischief O'Shea warned against. If the injunction plaintiffs seek were
> issued, any parent who was held in contempt despite his alleged
> indecency could and probably would seek relief in the federal district
> court on grounds that the state judge had violated the federal injunction.
> And what would the federal district court do? Would it make an
> independent determination of that parent's indigency in order to
> determine if the injunction had been violated? And if the district court
> concluded that the injunction had been violated, what would it do then?

Id. at 1549–50 (citations, quotation, & footnote omitted).  The court warned that if such an injunction were to issue, the court would need to be prepared to face the "unpleasant question" whether to jail a state judge for contempt if he refused to comply.  Id. at 1550 (quoting Luckey v. Miller, 896 F.2d 479, 481–82 (11th Cir. 1989) (Edmondson, J., dissenting)).  "Avoidance of this unseemly conflict between state and federal judges is one reason for O'Shea and Younger."  Id. See also Luckey v. Miller, 976 F.2d 673 (11th Cir. 1992).  Just as in Pompey, the state courts are already required to conduct an inquiry when setting bail that includes consideration of the arrestee's "financial resources." § 903.046(2)(c), Fla. Stat.; Fla. R. Crim. P.1.131(b)(2) & (3).  Thus, what Plaintiffs really want is to force the state courts to conduct a more "thorough inquiry," which, for the reasons stated in Pompey, would constitute an "affront to comity."

Other federal courts have held that abstention was required in cases in which plaintiffs asserted nearly identical claims as those asserted here.  In Wallace v. Kern, indigent pre-trial detainees filed a class action lawsuit alleging, among other things, that "the incarceration of indigent detainees unable to make bail violates the equal protection and due process clauses of the Fourteenth Amendment." 520 F.2d 400, 401 (2d Cir. 1975).  After a bench trial, the district court entered a judgment mandating certain changes to the bail system going forward, including requiring an adversarial hearing on the issue of bail and "a written statement of the judge's reasons for denying or fixing bail."  Id. at 403.  Applying Younger and O'Shea, the Second Circuit reversed and concluded that the court's order "created an intrusion upon existing state criminal process which is fissiparous and gratuitous."  Id. at 407–09.  See also Hernandez v. Carbone, 567

12

F. Supp. 2d 320, 332–33 (D. Conn. 2008) (dismissing equal protection challenge to imposition of money bail on indigents based on <u>Younger</u> abstention); <u>Mudd v. Busse</u>, 437 F. Supp. 505, 511–17 (N.D. Ind. 1977) (same); <u>Kaufman v. Kaye</u>, 466 F.3d 83, 86–87 (2d Cir. 2006) (collecting circuit court decisions agreeing that federal courts cannot "legislate and engraft new procedures upon existing state criminal practices").[5]

## IV.   COUNT I FAILS TO STATE A CLAIM UNDER § 1983[6]

### A.   Sheriff Williams Is a City Official for Purposes of § 1983[7]

The first step in applying § 1983 is to determine whether Sheriff Williams in his official capacity acts for the City or as "an arm of the state" with respect to the function at issue. The Eleventh Circuit has developed a four-factor inquiry to apply when making this determination, which takes into account:  "(1) how state law defines the entity; (2) what degree of control the State maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity." <u>Stanley v. Israel</u>, 843 F.3d 920, 924 (11th Cir. 2016) (citing <u>Manders v. Lee</u>, 338 F.3d 1304, 1309 (11th Cir.

---

[5] In a footnote in <u>Gerstein v. Pugh</u>, 420 U.S. 103, 108 n.9 (1975), the Supreme Court noted that <u>Younger</u> abstention was inapplicable to a trial court's injunctive order directing state court judges to hold probable cause hearings for defendants charged by information.  The Court noted that the injunction was not directed at the prosecutions as such, only the legality of pretrial detention without a judicial hearing. <u>Id.</u>  There is no indication that the Court's footnote was intended to overrule or alter the decision in <u>O'Shea</u>, which was decided only the previous year.  Moreover, the injunctive relief in <u>Gerstein</u>—mandating a judicial probable cause hearing where none had been held previously—is far less of an intrusion on federalism and comity than the relief Plaintiffs request.

[6] In determining a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must accept the allegations in the Complaint as true and must construe them in the light most favorable to Plaintiffs, giving it all reasonable inferences therefrom. <u>Stephens v. Dep't of Health & Human Servs.</u>, 901 F.2d 1571, 1573 (11th Cir. 1990). But Plaintiffs must allege "more than labels and conclusions, and formulaic recitation of the elements of a cause of action will not do." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007). To survive a motion to dismiss, the Complaint must allege factual matter, which, accepted as true, is sufficient to "state a claim to relief that is plausible on its face" and "raise[s] a right to relief above the speculative level." <u>Id.</u> at 555 & 570. <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009).

[7] There is no <u>Bivens</u>-type cause of action "directly under" the Fourteenth Amendment.  <u>Williams v. Bennett</u>, 689 F.2d 1370, 1390 (11th Cir. 1982) (rejecting direct constitutional violation theory under <u>Bivins</u> where § 1983 was available); <u>Hicks v. Lewis</u>, No. 95-218-CIV-T-17A, 1996 WL 172994, at *2 (M.D. Fla. Apr. 5, 1996) ("Where a party asserts a claim under § 1983, that section provides the exclusive remedy for any Constitutional violations, and a party has no independent cause of action under the various Constitutional provisions.").

2003) (*en banc*)).   Although Florida sheriffs have universally been held to be county officials in other contexts,[8] the analysis must be performed for each function at issue in a case.  Stanley, 843 F.3d at 924 (citing McMillian v. Monroe Cty., Ala., 520 U.S. 781, 785 (1997)).  Because (as set forth in subpart B, *infra*) Sheriff Williams does not set bail, the only relevant "function" with respect to the sheriff is his operation of the jail.

Concerning the first factor—how a state defines the entity—Florida law defines the sheriff as a "county officer."  Stanley, 843 F.3d at 926–27.  The sheriff is listed as a "county officer" in the Florida Constitution.  See art. VIII, § 1(d), Fla. Const.  Moreover, the office of the sheriff is established in article 8 of the City's charter, and the sheriff's duties are set forth in chapter 37 of the City's municipal code.  See art. 8, Charter; ch. 37, Code. Section 8.01 of the City's charter expressly provides that the sheriff "shall administer the prison farm and jails."  See art. 8, § 8.01, Charter.  Florida law requires counties to "designate a chief correctional officer" and authorizes the county to designate the sheriff as chief correctional officer.  §§ 951.06(1) & .061, Fla. Stat.  The City's municipal code establishes a "Department of Corrections to provide detention of both sentenced and nonsentenced inmates" under the control of the sheriff.  § 37.107(1), Code. Thus, the first factor weighs in favor of Sheriff Williams being a county officer.

The second factor—degree of state control—also weighs in favor of Sheriff Williams being a county officer.  Although § 951.06(2) requires that chief correctional officers "see that all rules and regulations prescribed by law or the department [of

---

[8] Stanley, 843 F.3d at 925–26 (hiring and firing as chief correctional officer); Abusaid v. Hillsborough Cty. Bd. of Cty. Comm'rs, 405 F.3d 1298, 1304 (11th Cir. 2005) (enforcing county ordinance); Hufford v. Rodgers, 912 F.2d 1338, 1341–42 (11th Cir. 1990) (training deputies); Lucas v. O'Loughlin, 831 F.2d 232, 234–36 (11th Cir. 1987) (employment decisions).

corrections] are fully observed and complied with," compliance with such laws does not make Sheriff Williams a state-actor with respect to operation of the jail. See Stanley, 843 F.3d at 928–29 (holding state statutes regarding qualifications for hiring did not tip factor in favor of arm-of-the-state status). JSO's role is to operate the jail, which includes detaining arrestees until ordered by the court.[9]   Compliance with those orders does not transform the sheriff into an "arm of the state" with respect to his function of operating the jail.   Thus, this factor, on the whole, tips in favor of Sheriff Williams being considered a county actor.

The third factor—the source of the sheriff's funds—and the fourth factor—responsibility for judgments against the sheriff—also weigh in favor of finding that Sheriff Williams is a county official.   These factors were thoroughly discussed by the Eleventh Circuit in Stanley in the context of jail operations.   Stanley, 843 F.3d at 929–31. Suffice it to say that the City funds the JSO, including the jail, and is responsible for paying judgments against Sheriff Williams in his official capacity.   Thus, applying the four Manders factors, it is clear that Sheriff Williams acts as an official of the City with respect to the function at issue in this case.

### B.   Plaintiffs Have Failed to Allege that Sheriff Williams Created or Allowed a Policy or Custom that Caused Constitutional Injury

Local governments like the City may be held liable under § 1983 only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the

---

[9] The City retains some limited control with respect to detention for violation of ordinances. The Mayor may grant "hardship releases" to "any person convicted of a violation of a City ordinance in County Court and sentenced to imprisonment or committed to jail for failure to pay a fine." § 640.101, Code.

injury." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690, 694 (1978).  The Monell "'policy or custom' requirement applies in § 1983 cases irrespective of whether the relief sought is monetary or prospective." Los Angeles Cty. v. Humphries, 562 U.S. 29, 39 (2010).  To establish a Monell claim, the plaintiff must show that: "(1) his constitutional rights were violated; (2) the municipal entity had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) the policy or custom caused the violation." McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004).  To satisfy the "policy or custom" requirement, the plaintiff must show an official policy, the actions of a local government official with final policymaking authority, or an unofficial custom or practice that is so longstanding and widespread that it assumes the force of law. Denno v. Sch. Bd. of Volusia Cty., 218 F.3d 1267, 1276 (11th Cir. 2000).  Only where the local government's policy or custom reflects a "deliberate" or "conscious" choice from among various alternatives can the municipality be liable for its conduct." City of Canton v. Harris, 489 U.S. 378, 389 (1989). The policy or custom must be the "moving force" behind the constitutional deprivation. Monell, 436 U.S. at 694–95.

To allege a policy, the plaintiff must identify the local government policymaker with "final policymaking authority with respect to the action alleged to have caused the particular constitutional or statutory violation." McMillian v. Johnson, 88 F.3d 1573, 1577–78 (11th Cir. 1996) aff'd sub nom., McMillian v. Monroe Cty., Ala., 520 U.S. 781 (1997).  A local government cannot make policy in an area if it has no power to make policy in that area. Id. at 1578 (holding the requirement that "a municipality must have power in an area to be held liable for an official's acts in that area . . . inheres in the

[Supreme] Court's municipal liability analysis").  As the Supreme Court observed:  "Our cases on the liability of local governments under § 1983 instruct us to ask whether governmental officials are final policymakers for the local government *in a particular area, or on a particular issue*."  McMillian, 520 U.S. at 785 (emphasis added).[10]

Plaintiffs do not allege that Sheriff Williams, or anyone at the JSO, at any time fixes the monetary amount of a misdemeanor arrestee's bail.  Rather, as alleged in the Complaint, the Misdemeanor Bond Schedule promulgated by administrative order of the chief judge of the Fourth Judicial Circuit is alleged to be "the exclusive means of setting bail 'unless otherwise directed by the judge(s).'" (Compl. ¶ 21).  Plaintiffs' allegations are confirmed by Florida law.[11]  In Florida, only judges have the power to set bail.  See § 903.03(1), Fla. Stat. ("[T]he *court* having jurisdiction to try the defendant shall . . . have jurisdiction to hear and decide all preliminary motions regarding bail . . . ." (emphasis added)); § 903.046(2), Fla. Stat. (listing factors "*the court* shall consider" when determining bail (emphasis added)).  See also Fla. R. Crim. P. 3.131(b); Campbell v. Johnson, 586 F.3d 835, 843 (11th Cir. 2009) ("As the district court correctly recognized, Florida law grants the *court* having jurisdiction to try the defendant the sole authority to hear and decide issues regarding bail, including the conditions of bail.").

---

[10] See also City of St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988) ("[T]he challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in *that area* of the city's business." (emphasis added)); Pembaur v. City of Cincinnati, 475 U.S. 469, 483 (1986) ("[M]unicipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy *with respect to the subject matter in question*." (emphasis added)).

[11] State law determines whether an official has final policymaking authority for a governmental entity.  McMillian, 520 U.S. at 786.

Florida law vests the chief judge of the Fourth Judicial Circuit with the power to establish the Misdemeanor Bond Schedule and further mandates Sheriff Williams' compliance with that schedule. See Art. V, § 2, Fla. Const. (chief judge is responsible for administrative supervision of the courts in his circuit); § 43.26, Fla. Stat. (chief judge has power "[t]o do everything necessary to promote the prompt and efficient administration of justice in the courts"); Fla. R. Jud. Admin. 2.215(b)(2) (chief judge has authority to require judges and "other court officers" comply with policies and administrative orders); § 26.49, Fla. Stat. (sheriff is "executive officer" of the circuit court); § 34.07, Fla. Stat. (sheriff shall "do and perform all duties in and about said [county] court, which are required to be performed by an executive officer"); § 30.15(1), Fla. Stat. (sheriff shall "[e]xecute all process of the . . . circuit courts, county courts" and "[p]erform such other duties as may be imposed upon them by law"); § 43.26(4), Fla. Stat. (failure to comply with an order of the chief judge constitutes "neglect of duty" for which an officer of the court may be suspended); Fla. R. Jud. Admin. 2.215(h) (same); Art. IV § 7(a), Fla. Const. (Governor may suspend county officers for "neglect of duty").

It has been repeatedly held that Florida judges are "arms of the state." E.g., Badillo v. Thorpe, 158 Fed. Appx. 208, 212–13 (11th Cir. 2005) (applying Manders factors and holding Florida circuit court judges and court administrators are state officials).[12] See also Art. V § 1, Fla. Const. (vesting judicial power in the supreme court, district courts of appeal, circuit courts and county courts"); § 26.021, Fla. Stat. (dividing

---

[12] See also Uberoi v. Sup. Ct. of Fla., 819 F.3d 1311, 1313–14 (11th Cir. 2016); McBrearty v. Koji, 348 Fed. Appx. 437, 440 (11th Cir. 2009); Kaimowitz v. Fla. Bar, 996 F.2d 1151 (11th Cir. 1993); Pullins v. Hagins, No. 3:14-CV-J-32PDB, 2015 WL 1456198, *9 (M.D. Fla. Mar. 23, 2015).

Florida into "into 20 judicial circuits" and providing the Fourth Judicial Circuit "is composed of Clay, Duval, and Nassau Counties"); § 900.03(1), Fla. Stat. ("Original jurisdiction in criminal cases is vested in the circuit courts and county courts."); § 26.012(2)(d), Fla. Stat. (circuit courts "shall have exclusive original jurisdiction . . . [o]f all felonies and of all misdemeanors arising out of the same circumstances as a felony which is also charged"); § 34.01(1)(a), Fla. Stat. ("county courts shall have original jurisdiction . . . [i]n all misdemeanor cases not cognizable by the circuit courts"). The Manders factors weigh in favor of the conclusion that Fourth Judicial Circuit judges are state actors with respect to their exclusive authority to set bail in misdemeanor cases.

Because Florida law gives the judges of the Fourth Judicial Circuit the exclusive authority to set bail for misdemeanor arrestees in Duval County and because those judges are state actors, the City cannot be liable for declaratory and injunctive relief under § 1983 for Plaintiffs' claims. The challenged policy of fixing monetary bail without considering an arrestee's ability to pay—whether by the Misdemeanor Bond Schedule or by the presiding judge at first appearance—is the policy of Florida's Fourth Judicial Circuit, not Sheriff Williams. The JSO does not make a "'deliberate' or 'conscious' choice from among various alternatives" when it comes to decisions as to bail; the JSO has no alternatives to choose from in that regard. Harris, 489 U.S. at 388. The choice is made by the judges of the Fourth Judicial Circuit.

Nor have Plaintiffs alleged that a policy or custom of Sheriff Williams' making that was the "moving force" behind the alleged constitutional violation. Here, again, the "moving force" behind the alleged violation caused by setting monetary bail without

19

considering ability to pay is the policy of the Fourth Judicial Circuit.  Sheriff Williams

and the JSO have no power or discretion to require, control, or remedy the conduct of the

judiciary.  Without some level of legal discretion—i.e., the ability to make a deliberate

choice between alternatives—there can be no local government policy or custom that was

the "moving force" behind the alleged constitutional violation.

The Eleventh Circuit, sitting en banc, has recognized that "local governments can

never be liable under § 1983 for the acts of those whom the local government has no

authority to control."  Turquitt v. Jefferson Cty., Ala., 137 F.3d 1285, 1292 (11th Cir.

1998) (en banc).  Turquitt involved a § 1983 claim by the estate of a pretrial detainee

who was killed by another inmate while in an Alabama county jail.  Id. at 1286.  The

estate blamed over-crowding at the jail and inadequate supervision and sued the county

and sheriff.  Id. at 1286–87.  After concluding that the sheriff acted for the state rather

than the county, the court held that the county could not be held liable for the acts of the

sheriff, over whom it had no control.  Id. at 1288–92.  The court, citing its decision in

McMillian, 88 F.3d at 1577, observed:  "A local government 'must have power in an area

in order to be held liable for an official's acts in that area.'"  Id. at 1292.  According to

the court, a local government can only be liable under § 1983 for injuries which it caused,

"and causation necessarily implies control."  Id. See also Collins v. Homestead Corr.

Inst., 452 Fed. Appx. 848, 851 (11th Cir. 2011) (holding no causal link existed with

respect to claimed eighth amendment violation in connection with inmate's hurricane

evacuation because local government defendant had no control over evacuation

procedures devised at the state level); Pompey, 95 F.3d at 1553 (holding county could not

be liable under § 1983 for allegedly unconstitutional practices concerning appointment of counsel because it "had neither the duty nor the authority to appoint counsel for the plaintiff; that duty and authority was the courts' alone"); <u>Familias Unidas v. Briscoe</u>, 619 F.2d 391, 404 (5th Cir. 1980) (holding county is not liable under § 1983 for enforcing a state law because the duty to implement state law "may more fairly be characterized as the effectuation of the policy of the State of Texas embodied in that statute").[13]

Plaintiffs' allegations that Sheriff Williams and the JSO "knew or should have known" the Fourth Judicial Circuit judges were violating the constitution by imposing monetary bail on indigents without inquiring into their ability to pay are not sufficient to allege a policy or custom on the part of Sheriff Williams.   A similar argument was expressly rejected by a panel of the Eleventh Circuit in <u>Powell v. Barrett</u>, 496 F.3d 1288, 1319–20 (11th Cir. 2007), <u>vacated on other grounds by</u> 541 F.3d 1298 (11th Cir. 2008)

---

[13] Decisions from the appellate courts of other federal circuits similarly stand for the proposition that a local government cannot be liable for complying with a non-discretionary state policy. <u>Snyder v. King</u>, 745 F.3d 242, 249 (7th Cir. 2014) ("When state law unequivocally instructs a municipal entity to produce binary outcome X if condition Y occurs, we cannot say that the municipal entity's 'decision' to follow that directive involves the exercise of any meaningful independent discretion, let alone final policymaking authority. It is the statutory directive, not the follow-through, which causes the harm of which the plaintiff complains." (footnote omitted)); <u>Vives v. City of New York</u>, 524 F.3d 346, 353 (2d Cir. 2008) ("Freedom to act is inherent in the concept of 'choice.' [W]e agree with all circuits to address state laws mandating enforcement by municipal police officers that a municipality's decision to honor this obligation is not a conscious *choice*. As a result, the municipality cannot be liable under Monell in this circumstance."); <u>Whitesel v. Sengenberger</u>, 222 F.3d 861, 872 (10th Cir. 2000) (holding county "cannot be liable for merely implementing a policy created by the state judiciary"); <u>Bethesda Lutheran Homes & Servs., Inc. v. Leean</u>, 154 F.3d 716, 718 (7th Cir. 1998) ("When the municipality is acting under compulsion of state or federal law, it is the policy contained in that state or federal law, rather than anything devised or adopted by the municipality, that is responsible for the injury."); <u>Eggar v. City of Livingston</u>, 40 F.3d 312, 316 (9th Cir. 1994) ("A municipality cannot be liable for judicial conduct it lacks the power to require, control, or remedy, even if that conduct parallels or appears entangled with the desires of the municipality."). <u>See also</u> <u>Cain v. City of New Orleans</u>, No: 15-4479, 2016 WL 2849498, *9 (E.D. La. May 13, 2016) (dismissing § 1983 claim against sheriff alleging unconstitutional practice of arresting indigents on warrants for nonpayment of court costs without inquiry into ability to pay because sheriff had no choice but to carry out the warrants and could not release detainees who failed to pay the stated bail amount); <u>Green v. Mayfield</u>, No. 3:08-cv-2287-L, 2009 WL 230161, *3 (N.D. Tex. Jan. 29, 2009) (dismissing § 1983 claim for unconstitutional excessive bail because sheriffs "have no role" in setting bail).

(*en banc*).[14]  <u>Powell</u> concerned a challenge to the constitutionality of a Georgia sheriff's policy of strip searching arrestees at the jail.  <u>Id.</u> at 1297.  The arrestees sued both the sheriff (the state actor who ran the jail) and the county.  <u>Id.</u> at 1304–08.  They argued <u>Monell</u> was satisfied by allegations the county "knew or should have known" of the sheriff's unconstitutional strip searches and were "deliberately indifferent" to the plaintiffs' rights.  <u>Id.</u> at 1319.  The panel rejected plaintiffs' argument and concluded that the link between the county's policy of placing arrestees at the jail and the unconstitutional strip searches conducted by the sheriff, over whom the county had no control, was "too attenuated to impose liability on the County."  <u>Id.</u> at 1319–20.  The panel recognized that had the arrestees not been placed at the jail, they would not have been strip-searched, but it concluded the county's actions were not the "moving force that animated" the sheriff's unconstitutional searches.  <u>Id.</u> ("Obviously if one retreats far enough from a constitutional violation some municipal 'policy' can be identified behind almost any . . . harm inflicted by a municipal official." (quoting <u>Oklahoma City v. Tuttle</u>, 471 U.S. 808, 823 (1985)).[15]

The only "policies" of Sheriff Williams fairly alleged in the Complaint are the policies of arresting people who commit misdemeanors and bringing them to the PTDF.  Of course, these "policies" are not unconstitutional, nor do Plaintiffs allege they are.  And

---

[14] The panel's decision with respect to the lack of the county's liability was not reviewed *en banc*.

[15] <u>See</u> <u>Surplus Store & Exch., Inc. v. City of Delphi</u>, 928 F.2d 788, 791–92 (7th Cir. 1991) ("It is difficult to imagine a municipal policy more innocuous and constitutionally permissible, and whose causal connection to the alleged violation is more attenuated, than the 'policy' of enforcing state law.  If the language and standards from *Monell* are not to become dead letter, such a 'policy' simply cannot be sufficient to ground liability against a municipality."); <u>Snyder</u>, 745 F.3d at 247 ("To say that any such direct causal link exists when the only local government 'policy' at issue is general compliance with the dictates of state law is a bridge too far; under those circumstances, the state law is the proximate cause of the plaintiff's injury.").

just as in <u>Powell</u>, placing arrestees in jail is not the "moving force that animates" the decisions of the Fourth Judicial Circuit judges regarding their setting conditions of pretrial release.

Plaintiffs will presumably rely on the decision of the United States District Court for the Southern District of Texas in <u>O'Donnell v. Harris County, Texas</u>, 227 F. Supp. 3d 706 (S.D. Tex. 2016).[16]   The plaintiffs in <u>O'Donnell</u> raised claims superficially similar to Plaintiffs' claims.  But the bail process in Harris County differs markedly from that of the Fourth Judicial Circuit, particularly with respect to the sheriff's role.[17]   Unlike Sheriff Williams, the Harris County sheriff was expressly required to comply with Texas law regarding *setting* bail, including consideration of ability to pay.  <u>O'Donnell</u>, 227 F. Supp. 3d at 715 & 751 (concluding the five-factor test required by Texas law for setting bail applied by its terms to the sheriff); Tex. Code Crim. Pro. Art. 17.15.   Further, the sheriff's office had its own policies and customs of preventing arrestees from timely raising before a judicial officer their inability to pay bail and preventing their access to counsel to assist them in reducing bail. <u>O'Donnell</u>, 227 F. Supp. 3d at 750 ("The plaintiffs have alleged that the Sheriff has some discretion to choose not to engage in conduct that the Sheriff knows is unconstitutional.").  Moreover, both the sheriff and the county judges were county policymakers.  <u>Id.</u> at 740–45.  Thus, <u>O'Donnell</u> did not involve one governmental agency's policy being construed as the policy of a separate

---

[16] The decisions in <u>O'Donnell</u> have been appealed to the Fifth Circuit.

[17] Unlike in Duval County, arrestees in Harris County "almost never have counsel at the probable cause and bail-setting hearing."  <u>O'Donnell v. Harris Cty., Tex.</u>, 251 F. Supp. 3d 1052, 1093 (S.D. Tex. 2017).  Unlike in Duval County, Harris County defendants "usually did not appear in the courtroom [for first appearance] before the County Judge unless they offered to plead guilty at that time, and bail review was done only in a minority of cases and frequently one or two *weeks* later."  <u>Id.</u> at 1101 (emphasis added).

agency that lacked any decision-making authority over the relevant area. If, however, O'Donnell must be read as holding that the alleged knowledge of and indifference to an unconstitutional practice of another agency is itself a policy, then it cannot be squared with the precedents cited above and was erroneously decided.[18]

## V.     THE COURT SHOULD DECLINE JURISDICTION OVER COUNT II

Upon dismissal of the § 1983 claim in Count I, this Court should dismiss the claim based on the Florida Constitution in Count II pursuant to 28 U.S.C. § 1367(c) in order to permit Plaintiffs to refile the claim in state court.

DATED this 27th day of October, 2017.

**OFFICE OF GENERAL COUNSEL**

*/s/ Jacob J. Payne*
Jon R. Phillips
Deputy General Counsel
Florida Bar No. 273813
Jacob J. Payne
Assistant General Counsel
Florida Bar No. 0639451
117 West Duval Street, Suite 480
Jacksonville, Florida 32202

---

[18] A careful review of the cases cited in O'Donnell do not support the conclusion that Monell liability can be imposed on a municipality based solely on allegations the municipal actors "knew or should have known" of unconstitutional activity of another agency. Doe v. Angelina Cty., 733 F. Supp. 245, 257 (E.D. Tex. 1990), did not involve separate governmental agencies, and the sheriff had created his own unconstitutional policy by acquiescence in the practice of jailers under his control. The court in De Luna v. Hidalgo Cty. Tex., 853 F. Supp. 2d 623, 641 (S.D. Tex. 2012), did not hold that county policy was created simply through deliberate indifference of the unconstitutional policy of another agency. Rather, the issue was whether the county itself created a policy of jailing individuals for non-payment of fines without inquiring into ability to pay. Id. at 640–41. In Dodds v. Logan Cty. Sheriff's Dep't, No. CIV-08-33-R, 2009 WL 8747487 (W.D. Okla. Aug. 3, 2009), the sheriff's act of acquiescing in an unconstitutional policy of the clerk in refusing to accept bail after hours (where the clerk had no authority in that area) constituted a policy created by the sheriff. Lawson v. Dallas Cty., 286 F.3d 257 (5th Cir. 2002), does not stand for the proposition that county policy can be established by deliberate indifference to a state actor's policy. Rather, the county's own policies restricted nurses' ability to care for paraplegic inmates and these policies were maintained with deliberate indifference to the inmate's rights. Id. at 263–64. Lastly, in Blumel v. Mylander, 954 F. Supp. 1547, 1556–57 (M.D. Fla. 1997), the Hernando County Sheriff itself maintained an unconstitutional policy on behalf of a private corporation that operated the jail whereby arrestees were detained indefinitely unless otherwise ordered by a court or other authority, even though the arrestee had not had a probable cause hearing for more than 30 days.

(904) 630-1837 (Telephone)
(904) 630-1316 (Facsimile)
jphillips@coj.net
jpayne@coj.net
*Counsel for Sheriff Williams*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY on the 27th day of October, 2017, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following CM/ECF Participants: none.

*/s/ Jacob J. Payne*
Jon R. Phillips
Deputy General Counsel
Florida Bar No. 273813
Jacob J. Payne
Assistant General Counsel
Florida Bar No. 0639451
117 West Duval Street, Suite 480
Jacksonville, Florida 32202
(904) 630-1837 (Telephone)
(904) 630-1316 (Facsimile)
jphillips@coj.net
jpayne@coj.net
*Counsel for Sheriff Williams*